2/27/2019 1:31:25 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **17-7505.pdf** | versus | **17-7505_new.pdf** |
| **33 pages (189 KB)** | | **33 pages (192 KB)** |
| 2/26/2019 2:08:44 PM | | 2/27/2019 1:29:59 PM |

**Total Changes**

**1**

**Content**

1 Replacement

0 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 11)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MADISON *v.* ALABAMA

### CERTIORARI TO THE CIRCUIT COURT OF ALABAMA, MOBILE COUNTY

No. 17–7505.  Argued October 2, 2018—Decided February 27, 2019

In *Ford* v. *Wainwright*, 477 U. S. 399, this Court held that the Eighth Amendment's ban on cruel and unusual punishments precludes executing a prisoner who has "lost his sanity" after sentencing. *Id.*, at 406.  And in *Panetti* v. *Quarterman*, 551 U. S. 930, the Court set out the appropriate competency standard: A State may not execute a prisoner whose "mental state is so distorted by a mental illness" that he lacks a "rational understanding" of "the State's rationale for [his] execution." *Id.*, at 958–959.

Petitioner Vernon Madison was found guilty of capital murder and sentenced to death.  While awaiting execution, he suffered a series of strokes and was diagnosed with vascular dementia.  In 2016, Madison petitioned the state trial court for a stay of execution on the ground that he was mentally incompetent, stressing that he could not recollect committing the crime for which he had been sentenced to die.  Alabama responded that Madison had a rational understanding of the reasons for his execution, even assuming he had no memory of committing his crime.  And more broadly, the State claimed that Madison failed to implicate *Ford* and *Panetti* because both decisions concerned themselves with gross delusions, which Madison did not have.  Following a competency hearing, the trial court found Madison competent to be executed.  On federal habeas review, this Court summarily reversed the Eleventh Circuit's grant of relief, holding that, under the "demanding" and "deferential standard" of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), "[n]either *Panetti* nor *Ford* 'clearly established' that a prisoner is incompetent to be executed" because of a simple failure to remember his crime. *Dunn* v. *Madison*, 583 U. S. ___, ___.  But the Court "express[ed] no view" on the question of Madison's competency outside of

the AEDPA context. *Id.*, at ___. When Alabama set a 2018 execution date, Madison returned to state court, arguing once more that his mental condition precluded the State from going forward. The state court again found Madison mentally competent.

*Held*:

1. Under *Ford* and *Panetti*, the Eighth Amendment may permit executing a prisoner even if he cannot remember committing his crime. *Panetti* asks only about a person's comprehension of the State's reasons for resorting to punishment, not his memory of the crime itself. And the one may exist without the other. Such memory loss, however, still may factor into the analysis *Panetti* demands. If that loss combines and interacts with other mental shortfalls to deprive a person of the capacity to comprehend why the State is exacting death as a punishment, then the *Panetti* standard will be satisfied. Pp. 9–11.

2. Under *Ford* and *Panetti*, the Eighth Amendment may prohibit executing a prisoner even though he suffers from dementia or another disorder rather than psychotic delusions. The *Panetti* standard focuses on whether a mental disorder has had a particular *effect*; it has no interest in establishing any precise *cause*. *Panetti*'s references to "gross delusions," 551 U. S., at 960, are no more than a predictable byproduct of that case's facts. *Ford* and *Panetti* hinge on the prisoner's "[in]comprehension of why he has been singled out" to die, 477 U. S., 409, and kick in if and when that failure of understanding is present, irrespective of whether one disease or another is to blame. In evaluating competency, a judge must therefore look beyond any given diagnosis to a downstream consequence. Pp. 12–14.

3. Because this Court is uncertain whether the state court's decision was tainted by legal error, this case is remanded to that court for renewed consideration of Madison's competency. The state court's brief 2018 ruling—which states only that Madison "did not prove a substantial threshold showing of insanity[ ]"—does not provide any assurance that the court knew a person with dementia, and not psychotic delusions, might receive a stay of execution. Nor does that court's initial 2016 opinion. The sole question on which Madison's competency depends is whether he can reach a rational understanding of why the State wants to execute him. In answering that question—on which this Court again expresses no view—the state court may not rely on any arguments or evidence tainted with the legal errors addressed by this Court. Pp. 14–18.

Vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined. KAVANAUGH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–7505

VERNON MADISON, PETITIONER *v.* ALABAMA

ON WRIT OF CERTIORARI TO THE CIRCUIT COURT OF ALABAMA, MOBILE COUNTY

[February 27, 2019]

JUSTICE KAGAN delivered the opinion of the Court.

The Eighth Amendment, this Court has held, prohibits the execution of a prisoner whose mental illness prevents him from "rational[ly] understanding" why the State seeks to impose that punishment. *Panetti* v. *Quarterman*, 551 U. S. 930, 959 (2007). In this case, Vernon Madison argued that his memory loss and dementia entitled him to a stay of execution, but an Alabama court denied the relief. We now address two questions relating to the Eighth Amendment's bar, disputed below but not in this Court. First, does the Eighth Amendment forbid execution whenever a prisoner shows that a mental disorder has left him without any memory of committing his crime? We (and, now, the parties) think not, because a person lacking such a memory may still be able to form a rational understanding of the reasons for his death sentence. Second, does the Eighth Amendment apply similarly to a prisoner suffering from dementia as to one experiencing psychotic delusions? We (and, now, the parties) think so, because either condition may—or, then again, may not—impede the requisite comprehension of his punishment. The only issue left, on which the parties still disagree, is what those rulings

mean for Madison's own execution. We direct that issue to the state court for further consideration in light of this opinion.

## I

## A

This Court decided in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), that the Eighth Amendment's ban on cruel and unusual punishments precludes executing a prisoner who has "lost his sanity" after sentencing. *Id.,* at 406. While on death row, Alvin Ford was beset by "pervasive delusion[s]" associated with "[p]aranoid [s]chizophrenia." *Id.,* at 402–403. Surveying both the common law and state statutes, the Court found a uniform practice against taking the life of such a prisoner. See *id.,* at 406–409. Among the reasons for that time-honored bar, the Court explained, was a moral "intuition" that "killing one who has no capacity" to understand his crime or punishment "simply offends humanity." *Id.,* at 407, 409; see *id.,* at 409 (citing the "natural abhorrence civilized societies feel" at performing such an act). Another rationale rested on the lack of "retributive value" in executing a person who has no comprehension of the meaning of the community's judgment. *Ibid.*; see *id.,* at 421 (Powell, J., concurring in part and concurring in judgment) (stating that the death penalty's "retributive force[] depends on the defendant's awareness of the penalty's existence and purpose"). The resulting rule, now stated as a matter of constitutional law, held "a category of defendants defined by their mental state" incompetent to be executed. *Id.,* at 419.

The Court clarified the scope of that category in *Panetti* v. *Quarterman* by focusing on whether a prisoner can "reach a rational understanding of the reason for [his] execution." 551 U. S., at 958. Like Alvin Ford, Scott Panetti suffered from "gross delusions" stemming from "extreme psychosis." *Id.,* at 936, 960. In reversing a

ruling that he could still be executed, the *Panetti* Court set out the appropriate "standard for competency." *Id.,* at 957. *Ford*, the Court now noted, had not provided "specific criteria." 551 U. S., at 957. But *Ford* had explored what lay behind the Eighth Amendment's prohibition, highlighting that the execution of a prisoner who cannot comprehend the reasons for his punishment offends moral values and "serves no retributive purpose." 551 U. S*.,* at 958. Those principles, the *Panetti* Court explained, indicate how to identify prisoners whom the State may not execute. The critical question is whether a "prisoner's mental state is so distorted by a mental illness" that he lacks a "rational understanding" of "the State's rationale for [his] execution." *Id.,* at 958–959. Or similarly put, the issue is whether a "prisoner's concept of reality" is "so impair[ed]" that he cannot grasp the execution's "meaning and purpose" or the "link between [his] crime and its punishment." *Id.,* at 958, 960.

B

Vernon Madison killed a police officer in 1985 during a domestic dispute. An Alabama jury found him guilty of capital murder, and the trial court sentenced him to death. He has spent most of the ensuing decades on the State's death row.

In recent years, Madison's mental condition has sharply deteriorated. Madison suffered a series of strokes, including major ones in 2015 and 2016. See Tr. 19, 46–47 (Apr. 14, 2016). He was diagnosed as having vascular dementia, with attendant disorientation and confusion, cognitive impairment, and memory loss. See *id.,* at 19–20, 52–54. In particular, Madison claims that he can no longer recollect committing the crime for which he has been sentenced to die. See Tr., Pet. Exh. 2, p. 8.

After his 2016 stroke, Madison petitioned the trial court for a stay of execution on the ground that he had become

mentally incompetent. Citing *Ford* and *Panetti*, he argued that "he no longer understands" the "status of his case" or the "nature of his conviction and sentence." Pet. for Suspension in No. CC–85–1385.80 (C. C. Mobile Cty., Ala., Feb. 12, 2016), pp. 11, 14. And in a later filing, Madison emphasized that he could not "independently recall the facts of the offense he is convicted of." Brief Pursuant to Order (Apr. 21, 2016), p. 8. Alabama countered that Madison had "a rational understanding of [the reasons for] his impending execution," as required by *Ford* and *Panetti*, even assuming he had no memory of committing his crime. Brief on Madison's Competency (April 21, 2016), pp. 4–5, 8. And more broadly, the State claimed that Madison could not possibly qualify as incompetent under those two decisions because both "concerned themselves with '[g]ross delusions'"—which all agree Madison does not have. *Id.,* at 2; see *ibid.* (Madison "failed to implicate" *Ford* and *Panetti* because he "does not suffer from psychosis or delusions").

Expert reports from two psychologists largely aligned with the parties' contending positions. Dr. John Goff, Madison's expert, found that although Madison "underst[ood] the nature of execution" in the abstract, he did not comprehend the "reasoning behind" Alabama's effort to execute *him*. Tr., Pet. Exh. 2 (Apr. 14, 2016), p. 8; see *id.,* at 9. Goff stated that Madison had "Major Vascular Neurological Disorder"—also called vascular dementia— which had caused "significant cognitive decline." *Ibid.* And Goff underscored that Madison "demonstrate[d] retrograde amnesia" about his crime, meaning that he had no "independent recollection[ ]" of the murder. *Id.,* at 8; see *id.,* at 9. For his part, Dr. Karl Kirkland, the court-appointed expert, reported that Madison "was able to discuss his case" accurately and "appear[ed] to understand his legal situation." Tr., Ct. Exh. 1, pp. 10–11. Although Kirkland acknowledged that Madison's strokes had led to

cognitive decline, see *id.,* at 10, the psychologist made no mention of Madison's diagnosed vascular dementia. Rather, Kirkland highlighted that "[t]here was no evidence of psychosis, paranoia, or delusion." *Id.,* at 9; see *ibid.* (Madison "did not seem delusional at all").

At a competency hearing, Alabama similarly stressed Madison's absence of psychotic episodes or delusions. The State asked both experts to affirm that Madison was "neither delusional [n]or psychotic." Tr. 56; see *id.*, at 22. And its closing argument focused on their agreement that he was not. As the State summarized: "He's not psychotic. He's not delusional." *Id.*, at 81. On the State's view, that fact answered the competency question because "[t]he Supreme Court is looking at whether someone's delusions or someone's paranoia or someone's psychosis is standing in the way of" rationally understanding his punishment. *Id.*, at 82. Madison's counsel disputed that point. "[T]he State would like to say, well, he's not delusional, he's not psychotic," the attorney recapped. *Id.*, at 83. But, she continued, "[t]hat's not really the criteria" under *Panetti.* Tr. 83. Rather, the Court there barred executing a person with any mental illness—"dementia" and "brain injuries" no less than psychosis and delusions—that prevents him from comprehending "why he is being executed." *Ibid.*

The trial court found Madison competent to be executed. Its order first recounted the evidence given by each expert witness. The summary of Kirkland's report and testimony began by stating that the psychologist had "found no evidence of paranoia[,] delusion [or] psychosis." Order (Apr. 29, 2016), p. 5 (2016 Order). The court then noted Kirkland's view that Madison could "give details of the history of his case" and "appear[ed] to understand his legal situation." *Ibid.* Turning to the Goff report, the court noted the expert's finding that Madison was "amnesic" and could not recollect his crime. *Id.,* at 6; see *id.,* at 7. In a single, final paragraph, the court provided both its

ruling and its reasoning. Madison had failed to show, the court wrote, that he did not "rationally understand the punishment he is about to suffer and why he is about to suffer it." *Id.,* at 10. The court "accept[ed] the testimony of Dr. Kirkland as to the understanding Madison has concerning the situation." *Ibid.* "Further," the court concluded, "the evidence does not support that Mr. Madison is delusional." *Ibid.*

Madison next sought habeas relief in federal court, where he faced the heavy burden of showing that the state-court ruling "involved an unreasonable application of[] clearly established federal law" or rested on an "unreasonable determination of the facts." Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. §2254(d). The District Court rejected his petition, but the Court of Appeals for the Eleventh Circuit ruled that Madison had demonstrated both kinds of indisputable error. See *Madison* v. *Commissioner*, 851 F. 3d 1173 (2017). This Court then summarily reversed the appeals court's decision. See *Dunn* v. *Madison*, 583 U. S. ___ (2017) (*per curiam*). We explained, contrary to the Eleventh Circuit's principal holding, that "[n]either *Panetti* nor *Ford* 'clearly established' that a prisoner is incompetent to be executed" because of a simple failure to remember his crime. *Id.,* at ___ (slip op., at 4). And we found that the state court did not act unreasonably—otherwise put, did not err "beyond any possibility for fairminded disagreement"—when it found that Madison had the necessary understanding to be executed. *Ibid.* (internal quotation marks omitted). But we made clear that our decision was premised on AEDPA's "demanding" and "deferential standard." *Id.,* at ___, ___ (slip op., at 3, 4). "We express[ed] no view" on the question of Madison's competency "outside of the AEDPA context." *Id.,* at ___ (slip op., at 4).[1]

—————

[1] Neither did we opine on—or even mention—the subsidiary legal

When Alabama set an execution date in 2018, Madison returned to state court to argue again that his mental condition precluded the State from going forward. In his petition, Madison reiterated the facts and arguments he had previously presented to the state court. But Madison also claimed that since that court's decision (1) he had suffered further cognitive decline and (2) a state board had suspended Kirkland's license to practice psychology, thus discrediting his prior testimony. See Pet. to Suspend Execution in No. CC–85–1385.80 (C. C. Mobile Cty., Ala., Dec. 18, 2017), pp. 1–2, 16–19.[2] Alabama responded that nothing material had changed since the court's first competency hearing. See Motion to Dismiss (Dec. 20, 2017), p. 9. The State also repeated its argument that *Panetti* permits executing Madison, pointing to the experts' agreement that he is "not delusional or psychotic" and

————————

question whether a mental disorder other than delusions may render a person incompetent to be executed. Alabama told the Eleventh Circuit that it could not, thus reprising the claim the State had made in the trial court. See *Madison*, 851 F. 3d, at 1188 (describing Alabama's argument that "only a prisoner suffering from gross delusions can show incompetency under *Panetti*"); Recording of Oral Arg. in No. 16–12279 (CA11, June 23, 2016), at 26:36–26:45 ("In this case, what we have is someone who claims to have a mental illness, dementia," but does not have "delusions, which is what *Panetti* requires"); *id.,* at 26:48–27:21 (When asked if someone with "severe dementia" but no delusions could be executed, the State responded "I think so because . . . they don't have delusions"). (Alabama *alternatively* argued that the state court's decision was not based on that view, see Brief for Appellee in No. 16–12279 (CA11), pp. 37–38; the quotations the dissent picks out, see *post,* at 10, n. 4, come from that additional argument.) The Eleventh Circuit rejected the State's contention that dementia could not preclude an execution as "inconsistent with the principles underlying" *Ford* and *Panetti*. 851 F. 3d, at 1188. But we had no reason to address that holding in light of the errors we saw in other parts of the appeals court's analysis.

[2] As Madison's petition recounted, the license suspension followed the opening of a criminal investigation into whether Kirkland had committed narcotics offenses. See Pet. to Suspend Execution 17–19.

asserting that neither "memory impairment [n]or dementia [could] suffice to satisfy the *Panetti* and *Ford* standards" without "an expansion" of those decisions. Motion to Dismiss 4, 10. A week before the scheduled execution, the state court again found Madison mentally competent. Its brief order stated only that Madison "did not provide a substantial threshold showing of insanity[ ] sufficient to convince this Court to stay the execution." App. A to Pet. for Cert.

Madison then filed in this Court a request to stay his execution and a petition for certiorari. We ordered the stay on the scheduled execution date and granted the petition a few weeks later. See 583 U. S. ___, ___ (2018). Because the case now comes to us on direct review of the state court's decision (rather than in a habeas proceeding), AEDPA's deferential standard no longer governs. (And for that reason—contrary to the dissent's suggestion, *post,* at 12—our decision on Madison's habeas petition cannot help resolve the questions raised here.)

## II

Two issues relating to *Panetti*'s application are before us. Recall that our decision there held the Eighth Amendment to forbid executing a prisoner whose mental illness makes him unable to "reach a rational understanding of the reason for [his] execution." 551 U. S., at 958; see *supra,* at 2–3. The first question presented is whether *Panetti* prohibits executing Madison merely because he cannot remember committing his crime. The second question raised is whether *Panetti* permits executing Madison merely because he suffers from dementia, rather than psychotic delusions.[3]  In prior stages of this case, as we

――――――

[3] The dissent is in high dudgeon over our taking up the second question, arguing that it was not presented in Madison's petition for certiorari. See *post,* at 1–6. But that is incorrect. The petition presented two questions—the same two we address here. The first question asked

have described, the parties disagreed about those matters. See *supra,* at 4–8. But at this Court, Madison accepted Alabama's position on the first issue and Alabama accepted Madison's on the second. See, *e.g.,* Tr. of Oral Arg. 11, 36. And rightly so. As the parties now recognize, the standard set out in *Panetti* supplies the answers to both questions. First, a person lacking memory of his crime may yet rationally understand why the State seeks to execute him; if so, the Eighth Amendment poses no bar to his execution. Second, a person suffering from dementia may be unable to rationally understand the reasons for his sentence; if so, the Eighth Amendment does not allow his execution. What matters is whether a person has the "rational understanding" *Panetti* requires—not whether he has any particular memory or any particular mental illness.

A

Consider initially a person who cannot remember his crime because of a mental disorder, but who otherwise has

———————

whether the Eighth Amendment bars executing Madison because he has no "memory of his commission of the capital offense." Pet. for Cert. iii. The second question asked whether that Amendment bars his execution because his "vascular dementia" and "severe cognitive dysfunction" prevent him from either remembering his crime "or understanding the circumstances of his scheduled execution." *Ibid.* So the first question concerned whether memory loss alone could form the basis of a *Panetti* claim and the second whether the varied consequences of dementia could do so. The body of the petition, to be sure, devoted more space to the first question. But it clearly referenced the second. See Pet. for Cert. 18 ("[T]his Court has never sought to constrain the world of maladies that can give rise to a finding that a prisoner is incompetent to be executed"); *id.,* at 25 ("[C]ourts have recognized dementia and attendant cognitive decline and memory impairment as a basis for a finding of incompetency to be executed"). And in any event, the number of words spent on each is not what matters. Our Rule states that the Court will consider "[o]nly the questions set out in the petition, or fairly included therein." This Court's Rule 14.1(a). Here, we consider, in order, the two questions set out in Madison's petition.

full cognitive function.  The memory loss is genuine: Let us say the person has some kind of amnesia, which has produced a black hole where that recollection should be. But the person remains oriented in time and place; he can make logical connections and order his thoughts; and he comprehends familiar concepts of crime and punishment. Can the State execute him for a murder?  When we considered this case before, using the deferential standard applicable in habeas, we held that a state court could allow such an execution without committing inarguable error.  See *Madison*, 583 U. S., at ___ (slip op., at 4) (stating that no prior decision had "clearly established" the opposite); *supra,* at 6.  Today, we address the issue straight-up, sans any deference to a state court.  Again, is the failure to remember committing a crime alone enough to prevent a State from executing a prisoner?

It is not, under *Panetti*'s own terms.  That decision asks about understanding, not memory—more specifically, about a person's understanding of why the State seeks capital punishment for a crime, not his memory of the crime itself.  And the one may exist without the other. Do you have an independent recollection of the Civil War? Obviously not.  But you may still be able to reach a rational—indeed, a sophisticated—understanding of that conflict and its consequences.  Do you recall your first day of school?  Probably not.  But if your mother told you years later that you were sent home for hitting a classmate, you would have no trouble grasping the story.  And similarly, if you somehow blacked out a crime you committed, but later learned what you had done, you could well appreciate the State's desire to impose a penalty.  Assuming, that is, no other cognitive impairment, loss of memory of a crime does not prevent rational understanding of the State's reasons for resorting to punishment.  And that kind of comprehension is the *Panetti* standard's singular focus.

The same answer follows from the core justifications *Panetti* offered for framing its Eighth Amendment test as it did. Echoing *Ford, Panetti* reasoned that execution has no retributive value when a prisoner cannot appreciate the meaning of a community's judgment. See 551 U. S., at 958–959 (citing 477 U. S., at 407–408); *supra,* at 3. But as just explained, a person who can no longer remember a crime may yet recognize the retributive message society intends to convey with a death sentence. Similarly, *Ford* and *Panetti* stated that it "offends humanity" to execute a person so wracked by mental illness that he cannot comprehend the "meaning and purpose of the punishment." 477 U. S., at 407; 551 U. S., at 960; see *id.,* at 958. But that offense to morality must be much less when a person's mental disorder causes nothing more than an episodic memory loss. Moral values do not exempt the simply forgetful from punishment, whatever the neurological reason for their lack of recall.

But such memory loss still may factor into the "rational understanding" analysis that *Panetti* demands. If that loss combines and interacts with other mental shortfalls to deprive a person of the capacity to comprehend why the State is exacting death as punishment, then the *Panetti* standard will be satisfied. That may be so when a person has difficulty preserving any memories, so that even newly gained knowledge (about, say, the crime and punishment) will be quickly forgotten. Or it may be so when cognitive deficits prevent the acquisition of such knowledge at all, so that memory gaps go forever uncompensated. As *Panetti* indicated, neurologists, psychologists, and other experts can contribute to a court's understanding of issues of that kind. See *id.,* at 962. But the sole inquiry for the court remains whether the prisoner can rationally understand the reasons for his death sentence.

## B

Next consider a prisoner who suffers from dementia or a similar disorder, rather than psychotic delusions. The dementia, as is typical, has compromised this prisoner's cognitive functions. But it has not resulted in the kind of delusional beliefs that Alvin Ford and Scott Panetti held. May the prisoner nonetheless receive a stay of execution under *Ford* and *Panetti*? Or instead, is a delusional disorder a prerequisite to declaring a mentally ill person incompetent to be executed? We did not address that issue when we last considered this case, on habeas review; in that sense, the question is one of first impression. See *supra,* at 6, n. 1.

But here too, *Panetti* has already answered the question. Its standard focuses on whether a mental disorder has had a particular *effect*: an inability to rationally understand why the State is seeking execution. See *supra,* at 2–3. Conversely, that standard has no interest in establishing any precise *cause*: Psychosis or dementia, delusions or overall cognitive decline are all the same under *Panetti*, so long as they produce the requisite lack of comprehension. To be sure, *Panetti* on occasion spoke of "gross delusions" in explaining its holding. 551 U. S., at 960. And similarly, *Ford* talked about the "insane," which sometimes refers to persons holding such irrational beliefs. See, *e.g.,* 477 U. S., at 401, 410.[4] But those references are no more than a predictable byproduct of the two cases' facts. At the same time (and interchangeably), *Panetti* used more inclusive terms, such as "mental ill-

―――――――

[4] Alternatively, however, the term may also be used to encompass persons with other mental conditions, so long as they are "severe enough [to] prevent[] a person from having legal capacity and excuse[ ] the person from criminal or civil responsibility." Black's Law Dictionary 914 (10th ed. 2014). In that different understanding, "insanity" connotes a general standard of legal competency rather than a more limited description of delusional disorders.

ness," "mental disorder," and "psychological dysfunction." 551 U. S., at 936, 959, 960; see *Ford*, 477 U. S., at 408–409, n. 2 (referring to prisoners with "mental illness"). And most important, *Panetti* framed its test, as just described, in a way utterly indifferent to a prisoner's specific mental illness. The *Panetti* standard concerns, once again, not the diagnosis of such illness, but a consequence—to wit, the prisoner's inability to rationally understand his punishment.

And here too, the key justifications *Ford* and *Panetti* offered for the Eighth Amendment's bar confirm our conclusion about its reach. As described above, those decisions stated that an execution lacks retributive purpose when a mentally ill prisoner cannot understand the societal judgment underlying his sentence. See *Panetti*, 551 U. S., at 958–959; *Ford*, 477 U. S., at 409; *supra,* at 2–3. And they indicated that an execution offends morality in the same circumstance. See 551 U. S., at 958, 960; 477 U. S., at 409; *supra,* at 2–3. Both rationales for the constitutional bar thus hinge (just as the *Panetti* standard deriving from them does) on the prisoner's "[in]comprehension of why he has been singled out" to die. 477 U. S., at 409; see *supra,* at 2–3. Or said otherwise, if and when that failure of understanding is present, the rationales kick in—irrespective of whether one disease or another (say, psychotic delusions or dementia) is to blame.

In evaluating competency to be executed, a judge must therefore look beyond any given diagnosis to a downstream consequence. As *Ford* and *Panetti* recognized, a delusional disorder can be of such severity—can "so impair the prisoner's concept of reality"—that someone in its thrall will be unable "to come to grips with" the punishment's meaning. *Panetti*, 551 U. S., at 958; *Ford*, 477 U. S., at 409. But delusions come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires. See *Panetti*, 551

U. S*.,* at 962 (remanding the case to consider expert evidence on whether the prisoner's delusions did so). And much the same is true of dementia. That mental condition can cause such disorientation and cognitive decline as to prevent a person from sustaining a rational understanding of why the State wants to execute him. See *supra,* at 11–12. But dementia also has milder forms, which allow a person to preserve that understanding. Hence the need—for dementia as for delusions as for any other mental disorder—to attend to the particular circumstances of a case and make the precise judgment *Panetti* requires.

## III

The only question left—and the only one on which the parties now disagree—is whether Madison's execution may go forward based on the state court's decision below. Madison's counsel says it cannot because that ruling was tainted by legal error—specifically, the idea that only delusions, and not dementia, can support a finding of mental incompetency. See Tr. of Oral Arg. 12, 21, 25, 27. Alabama counters that the state court did not rely on that (concededly) incorrect view of the law. See *id.*, at 37–41. But we come away at the least unsure whether that is so—especially given Alabama's evidence and arguments in the state court.

As noted earlier, the 2018 ruling we review today contains only one sentence of explanation. See *supra,* at 7–8. It states that Madison "did not provide a substantial threshold showing of insanity[ ] sufficient to convince this Court to stay the execution." App. A to Pet. for Cert. If the state court used the word "insanity" to refer to a delusional disorder, then error occurred: The court would have denied a stay on the ground that Madison did not have that specific kind of mental illness. And the likelihood that the court made that mistake is heightened by the State's emphasis, at that stage of the proceedings (as at

others), that Madison was "not delusional or psychotic" and that "dementia" could not suffice to bar his execution absent "an expansion of *Ford* and *Panetti*." Motion to Dismiss 4, 10; see *supra,* at 4–8; but see *post,* at 9–10, and n. 4 (disregarding those arguments).[5] Alabama argues, however, that the court spoke of "insanity" only because the state statute under which Madison sought relief uses that term. See Tr. of Oral Arg. 37; Ala. Code §15–16–23 (2011) (allowing a stay of execution "on account of the [convict's] insanity"). But even if so, that does not advance the State's view that the state court properly understood the Eighth Amendment bar when assessing Madison's competency. Alabama told this Court in opposing certiorari that its statute covers only those with delusional disorders, and not those with dementia. See Brief in Opposition 12 ("[T]he sole question to be answered under the state statute was whether Madison was insane, not whether he suffered from dementia"). The state court's (supposed) echoing of statutory language understood in that way cannot provide assurance that the court knew a person with dementia might receive a stay of execution; indeed, it suggests exactly the opposite. The court's 2018 order thus calls out for a do-over.

Alabama further contends, however, that we should look past the state court's 2018 decision to the court's initial 2016 determination of competency. (The dissent similarly begins with the 2016 ruling, see *post,* at 6–7, even though that is not the decision under review here.) According to the State, nothing material changed in the interim period, see *supra,* at 7; thus, we may find the meaning of the later ruling in the earlier one, see Tr. of Oral Arg. 36–37. And,

―――――――

[5] The State once again repeated that argument in its Brief in Opposition to Madison's certiorari petition. See Brief in Opposition 11–12 ("Madison does not argue that he is insane. Instead, he argues that he suffers from dementia" and that his execution should be barred "under a yet-unannounced expansion of *Ford* and *Panetti*").

the State continues, the 2016 opinion gets the law right. Alabama's proof is that the court, after summarizing the psychologists' testimony, found that "Madison has a rational[] understanding, as required by *Panetti*," concerning the "punishment he is about to suffer and why he is about to suffer it." 2016 Order, at 10; see Tr. of Oral Arg. 39; *supra,* at 5–6. (The dissent quotes the same passage. See *post,* at 7.)

But the state court's initial decision does not aid Alabama's cause. First, we do not know that the court in 2018 meant to incorporate everything in its prior opinion. The order says nothing to that effect; and though it came out the same way as the earlier decision, it need not have rested on all the same reasoning. Second, the 2016 opinion itself does not show that the state court realized that persons suffering from dementia could satisfy the *Panetti* standard. True enough, as Alabama says, that the court accurately stated that standard in its decision. But as described above, Alabama had repeatedly argued to the court (over Madison's objection) that only prisoners suffering from delusional disorders could qualify as incompetent under *Panetti*. See, *e.g.,* Brief on Madison's Competency 2 (Madison "failed to implicate" *Ford* and *Panetti* because he "does not suffer from psychosis or delusions"); Tr. 82 ("The Supreme Court [in *Panetti*] is looking at whether someone's delusions or someone's paranoia or someone's psychosis is standing in the way of" rationally understanding his punishment); see also *supra,* at 4–5; but see *post,* at 9–10, and n. 4 (disregarding those arguments). And Alabama relied on the expert opinion of a psychologist who highlighted Madison's lack of "psychosis, paranoia, or delusion," while never mentioning his dementia. Tr., Ct. Exh. 1 (Apr. 14, 2016), p. 9. That too-limited understanding of *Panetti*'s compass is reflected in the court's 2016 opinion. In its single paragraph of analysis, the court "accept[ed] the testimony" of the State's preferred psy-

chologist.[6]  And the court further found that "the evidence
does not support that Mr. Madison is delusional"—without
ever considering his undisputed dementia.  2016 Order,
at 10.

For those reasons, we must return this case to the state
court for renewed consideration of Madison's competency
(assuming Alabama sets a new execution date).  See, *e.g.,
Kindred Nursing Centers L. P.* v. *Clark*, 581 U. S. ___, ___
(2017) (slip op., at 9) (remanding when "uncertain" whether
"an impermissible taint occurred"); *Clemons* v. *Mississippi*,
494 U. S. 738, 751–752 (1990) (similar).  In that proceed-
ing, two matters disputed below should now be clear.
First, under *Ford* and *Panetti,* the Eighth Amendment
may permit executing Madison even if he cannot remem-
ber committing his crime.  Second, under those same
decisions, the Eighth Amendment may prohibit executing
Madison even though he suffers from dementia, rather
than delusions.  The sole question on which Madison's
competency depends is whether he can reach a "rational
understanding" of why the State wants to execute him.
*Panetti*, 551 U. S., at 958.  In answering that question—on
which we again express no view, see *supra,* at 6—the state
court may not rely on any arguments or evidence tainted
with the legal errors we have addressed.  And because
that is so, the court should consider whether it needs to
supplement the existing record.  Some evidence in that
record, including portions of the experts' reports and
testimony, expressly reflects an incorrect view of the
relevance of delusions or memory; still other evidence
might have implicitly rested on those same misjudgments.

––––––––––

[6] The court well understood that expert's exclusive focus on whether
Madison had psychotic delusions.  In summarizing his testimony, the
court began as follows: "Dr. Kirkland in his exam found no evidence of
paranoia or delusion at the time of his examin[ation], on March 31,
2016.  He also found that there was no psychosis present."  2016 Order,
at 5; see *supra,* at 5.

The state court, we have little doubt, can evaluate such matters better than we. It must do so as the first step in assessing Madison's competency—and ensuring that if he is to be executed, he understands why.

We accordingly vacate the judgment of the state court and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*


JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–7505

_____

## VERNON MADISON, PETITIONER *v.* ALABAMA

ON WRIT OF CERTIORARI TO THE CIRCUIT COURT OF
ALABAMA, MOBILE COUNTY

[February 27, 2019]

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting.

What the Court has done in this case makes a mockery of our Rules.

Petitioner's counsel convinced the Court to stay his client's execution and to grant his petition for a writ of certiorari for the purpose of deciding a clear-cut constitutional question: Does the Eighth Amendment prohibit the execution of a murderer who cannot recall committing the murder for which the death sentence was imposed? The petition strenuously argued that executing such a person is unconstitutional.

After persuading the Court to grant review of this question, counsel abruptly changed course. Perhaps because he concluded (correctly) that petitioner was unlikely to prevail on the question raised in the petition, he conceded that the argument advanced in his petition was wrong, and he switched to an entirely different argument, namely, that the state court had rejected petitioner's claim that he is incompetent to be executed because the court erroneously thought that dementia, as opposed to other mental conditions, cannot provide a basis for such a claim. See Brief for Petitioner 16.

This was not a question that the Court agreed to hear; indeed, there is no mention whatsoever of this argument in the petition—not even a hint. Nor is this question

fairly included within those on which the Court granted review. On the contrary, it is an entirely discrete and independent question.

Counsel's tactics flagrantly flouted our Rules. Our Rules make it clear that we grant certiorari to decide the specific question or questions of law set out in a petition for certiorari. See this Court's Rule 14.1(a) ("Only the questions set out in the petition, or fairly included therein, will be considered by the Court"). Our whole certiorari system would be thrown into turmoil if we allowed counsel to obtain review of one question and then switch to an entirely different question after review is granted. In the past when counsel have done this, we have dismissed the writ as improvidently granted. See, *e.g., Visa, Inc.* v. *Osborn*, 580 U. S. ___ (2016); *City and County of San Francisco* v. *Sheehan*, 575 U. S. ___ (2015). We should do that here.

Instead, the majority rewards counsel's trick. It vacates the judgment below because it is unsure whether the state court committed the error claimed in petitioner's merits brief. But not only was there no trace of this argument in the petition, there is nothing in the record showing that the state court ever adopted the erroneous view that petitioner claims it took.

I

The question on which we granted review was an outgrowth of our *per curiam* decision in *Dunn* v. *Madison*, 583 U. S. ___ (2017), which concerned an Eleventh Circuit decision granting petitioner federal habeas relief. Prior to that decision, this Court had held in *Ford* v. *Wainwright*, 477 U. S. 399 (1986), that the Eighth Amendment prohibits the execution of a person who is "insane," and in *Panetti* v. *Quarterman*, 551 U. S. 930 (2007), the Court elaborated on this rule, explaining that a person cannot be executed if he lacks a rational understanding of the reason for the

execution. The Eleventh Circuit interpreted those cases to mean that petitioner could not be executed because he did not remember killing his victim, Mobile, Alabama, police officer Julius Schulte.

We summarily reversed. Under the relevant provision of the federal habeas statute, 28 U. S. C. §2254(d), which was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), petitioner could not obtain federal habeas relief unless the state court's rejection of his memory-loss claim represented an unreasonable application of federal law as clearly established at the time by decisions of this Court. We held that neither *Ford* nor *Panetti* clearly established that a person cannot be executed if he does not remember committing the crime for which the death sentence was imposed.

Our opinion stated, however, that it "express[ed] no view on the merits of the underlying question outside of the AEDPA context." *Dunn*, 583 U. S., at \_\_\_ (slip op., at 4). And a concurring opinion authored by JUSTICE GINSBURG and joined by JUSTICES BREYER and SOTOMAYOR teed up this question for review in a later case. *Id.,* at \_\_\_ (slip op., at 1) ("The issue whether a State may administer the death penalty to a person whose disability leaves him without memory of his commission of a capital offense is a substantial question not yet addressed by the Court. Appropriately presented, the issue would warrant full airing").

Taking this cue, petitioner then sought relief in state court based on his inability to remember his crime, and when that effort failed, he filed the petition at issue now.

## II

The centerpiece of the petition and petitioner's 11th-hour application for a stay of execution[1] was the argument

—————

[1] Petitioner sought and obtained a stay of execution based on this

that he could not constitutionally be executed because he did not remember killing Officer Schulte. The petition repeatedly noted petitioner's inability to remember his crime. See Pet. for Cert. i, iii, 1, 2, 8, 10, 11, 12, 18, 22, 23, 25, 26, 27, 28. And the petition was very clear about the question on which review was sought:

> "[T]his case presents this Court with the appropriate vehicle to consider the substantial question of whether the execution of a prisoner with no memory of the underlying offense is consistent with the evolving standards of decency inherent in this Court's Eighth Amendment jurisprudence." *Id.,* at 2.

This same point was made time and again:

- "[B]ecause [petitioner's] disability renders him unable to remember the underlying offense for which he is to be punished, his execution does not comport with the evolving standards of decency required by this Court's Eighth Amendment jurisprudence." *Id.,* at 18.
- "[I]mposing death on a prisoner, who, like Mr. Madison, suffers from substantial memory deficits by virtue of multiple stroke and resulting vascular dementia serves no retributive or deterrent purpose." *Id.,* at 22.
- "[E]xecuting an individual with no memory of the underlying offense serves no retributive purpose." *Ibid.*
- "[W]here the person being punished has no memory of the commission of the offense for which he is to be executed, the 'moral quality' of that punishment is lessened and unable to match outrage over the offense." *Id.,* at 22–23.

———————

same argument. See Application for Stay of Execution 2, 6 (moving the Court to stay petitioner's execution so that it could address the "substantial" and "critical" question whether executing petitioner, "whose severe cognitive dysfunction leaves him without memory of his commission of the capital offense," would violate the Eighth Amendment).

- "Mr. Madison's severe memory impairments as a result of vascular dementia render him incompetent to be executed under the Eight Amendment." *Id.,* at 25 (quotation altered).

In sum, the body of the petition makes it clear that review was sought on the question invited by the *Dunn* concurrence, and the thrust of the wording of the two questions was the same. They read as follows:

"1. Consistent with the Eighth Amendment, and this Court's decisions in *Ford* and *Panetti*, may the State execute a prisoner whose mental disability leaves him without memory of his commission of the capital offense? See *Dunn* v. *Madison*, [583 U. S. \_\_\_, \_\_\_ (2017) (GINSBURG, J., joined by BREYER and SOTOMAYOR, JJ., concurring).]

"2. Do evolving standards of decency and the Eighth Amendment's prohibition of cruel and unusual punishment bar the execution of a prisoner whose competency has been compromised by vascular dementia and multiple strokes causing severe cognitive dysfunction and a degenerative medical condition which prevents him from remembering the crime for which he was convicted or understanding the circumstances of his scheduled execution?" Pet. for Cert. iii.

With the exception of the final phrase in question two ("or understanding the circumstances of his scheduled execution"), both questions solely concern the effect of memory loss on an Eighth Amendment analysis. The final phrase in question two and certain passages in the petition, if read with an exceedingly generous eye, *might* be seen as a basis for considering whether the evidence in the state-court record shows that petitioner's dementia rendered him incapable of having a rational understanding of the reason for his execution. But that is the sort of fact-bound question on which we rarely grant review, see this

Court's Rule 10, and it is questionable whether we did so here.

But whether or not the petition may be fairly read to present that factbound question, it is a travesty to read it as challenging the state-court order on the ground that the state court erroneously believed that dementia cannot provide a basis for a *Ford/Panetti* claim. There is no inkling of that argument in the petition. Although the petition described the state-court order at numerous places, the petition never claimed that the order was based on an impermissible distinction between dementia and other mental conditions. See, *e.g.,* Pet. for Cert. ii, 2–3, 16. And in fact, there is a point in the petition where such an interpretation of the state-court order would surely have been mentioned if the petition had intended to raise it as a ground for review. The petition noted that "courts have recognized dementia and attendant cognitive decline and memory impairment as a basis for a finding of incompetency to be executed," *id.,* at 25, but the petition did not follow that statement by claiming that the state court in this case took a contradictory position.

Because the petition did not raise—indeed, did not even hint at—the argument on which the Court now grants relief, the Court's decision is insupportable.[2] It violates our Rule that "[o]nly the questions set out in the petition, or fairly included therein, will be considered by the Court." See Rule 14.1(a).

## III

Even if it were proper for us to consider whether the order below was based on an erroneous distinction between dementia and other mental conditions, there is little reason to think that it was. After a full evidentiary hear-

―――――――――

[2] The Court is unable to cite a single place in the petition that makes any reference to the argument that the state court failed to understand that dementia could satisfy the *Ford/Panetti* test.

ing in 2016, the state court rejected petitioner's *Ford*/*Panetti* claim based on a correct statement of the holding of those decisions. It found that petitioner "ha[d] not carried his burden [of showing] by a preponderance of the evidence . . . that he . . . does not rationally understand the punishment he is about to suffer and why he is about to suffer it." Order (Apr. 29, 2016), p. 10. The court's order went on to say that it "specifically [found] that Madison has a rationa[l] understanding, as required by *Panetti*, that he is going to be executed because of the murder he committed and a rationa[l] understanding that the State is seeking retribution and that he will die when he is executed." *Ibid.*

In concluding that the state court might have drawn a distinction between dementia and other mental conditions, the majority seizes upon the wording of the order issued after a subsequent hearing in 2018. *Ante,* at 14. In that order, the same judge wrote: "Defendant did not provide a substantial threshold showing of *insanity*, a requirement set out by the United States Supreme Court, sufficient to convince this Court to stay the execution." Order (Jan. 16, 2018), p. 1 (emphasis added). The majority worries that the state-court judge might not have applied the same standard in 2018 as he had two years earlier and might have viewed "insanity" as something narrower than the standard mandated by *Ford* and *Panetti*. This concern is unfounded.

Taken out of context, the term "insanity" might not be read to encompass dementia, but in context, it is apparent that the state court's use of that term was based on the way in which it was used in *Ford* and *Panetti*. The state court did not simply refer to "insanity." It referred to "insanity, a requirement set out by the United States Supreme Court." Thus, it followed the term "insanity" with an appositive, which is a word or phrase that re-names the word or phrase that precedes it. In other

words, what the state court clearly meant by "insanity" was what this Court termed insanity in *Ford* and *Panetti*. What was that?

In *Ford*, the Court held that the Eighth Amendment prohibits the execution of a person who is "insane," and in the portion of Justice Marshall's lead opinion that was joined by a plurality, Justice Marshall equated insanity with a mental condition that "prevents [a person] from comprehending the reasons for the penalty or its implications." 477 U. S., at 417. Justice Powell, who provided the fifth vote for the decision, took a similar position. See *id.,* at 422–423 (opinion concurring in part and concurring in judgment). In *Panetti*, which built on the holding in *Ford*, the Court used the term in a similar way. See 551 U. S., at 958–960. Accordingly, a defendant suffers from "insanity," as the term is used in *Ford* and *Panetti*, if the prisoner does not understand the reason for his execution.

Today's decision does not reject this interpretation of the state-court order; it says only that it is vacating and remanding because it is "at the least unsure" whether the state court used the term "insanity" in this way. *Ante,* at 14. The majority cites two reasons for its uncertainty, but both are weak.

First, the majority attributes to the state court an interpretation of the term "insanity" that was advanced by the State in this Court in its brief in opposition to the petition for certiorari. *Ante,* at 15. In that submission, the State argued that certiorari should be denied because petitioner had sought relief in state court under the wrong provision of state law, namely, Ala. Code §15–16–23 (2011), which authorizes the suspension of the execution of an inmate who is "insane." The State argued that petitioner's memory loss did not render him "insane" within the meaning of this statute and that if he wished to argue that the Eighth Amendment bars the execution of an inmate who cannot remember his crime, he "should have filed a peti-

tion for post-conviction relief" under Alabama Rule of Criminal Procedure 32.4. Brief in Opposition 11–12.

The majority's argument based on the State's brief in opposition suffers from multiple defects. For one thing, nothing suggests that the state court rejected petitioner's application on the ground that he invoked the wrong provision of state law; the State's filing in the state court made no mention of the argument set out in its brief in opposition filed here. Moreover, if the state court had rejected petitioner's application on the ground that he moved under the wrong provision of state law, it is doubtful that we could review that decision, for then it would appear to rest on an adequate and independent state-law ground. And to top things off, the majority's argument distorts what the State's brief in opposition attempted to say about the term "insane." The State did not argue that a defendant who lacks a rational understanding of the reason for his execution due to dementia is not "insane" under Ala. Code §15–16–23. Instead, the State's point was that a defendant is not "insane" in that sense merely because he cannot remember committing the crime for which he was convicted.

The majority's other proffered basis for doubt is that the State "repeatedly argued to the [state] court (over Madison's objection) that only prisoners suffering from delusional disorders could qualify as incompetent under *Panetti*." *Ante,* at 16. The majority, however, cites no place where the State actually made such an argument. To be sure, the State, in contending that petitioner was not entitled to relief under *Ford* and *Panetti*, argued strenuously that he was not delusional. (The State made this argument because petitioner's counsel claimed that petitioner was in fact delusional and fell within *Ford* and *Panetti* for that reason.[3]) But arguing, as the State did, that petitioner

──────────

[3] Petitioner's papers emphasized again and again that he suffers from

was not entitled to relief because the claim that he was
delusional was untrue is not the same as arguing that
petitioner could be executed even if his dementia rendered
him incapable of understanding the reason for his execu-
tion.  The majority cites no place where the State made
the latter argument in the state court.[4]  And even if the

————————

delusions.  See Pet. for Suspension in No. CC–85–1385.80 (C. C. Mobile
Cty., Ala., Feb. 12, 2016), p. 1 ("Mr. Madison has long suffered from
serious mental illness, marked by paranoid delusions and other disabil-
ities"); *id.*, at 5 ("At Mr. Madison's trial, Dr. Barry Amyx established
that Mr. Madison suffers from a delusional disorder that has existed
since he was an adolescent"); *ibid.* ("This well-documented history of
paranoia was one of the reasons Dr. Amyx concluded that Mr. Madison
had a delusional disorder in a paranoid, really a persecutory type"
(internal quotation marks omitted)); *ibid.* ("Dr. Amyx noted that Mr.
Madison exhibited delusional thinking about . . . medication and
believed that he was being used as a guinea pig in medical experi-
ments"); *id.*, at 6 (emphasizing a "more recent observation" that "'Mr.
Madison consistently presented with paranoid delusions'"); *id.*, at 8
("Mr. Madison exhibited delusional and disoriented behavior in June
2015"); *id.*, at 14 ("decades of delusional thinking and psychotropic
medications"); see also Pet. for Suspension in No. CC–85–1385.80 (C. C.
Mobile Cty., Ala., Dec. 18, 2017), pp. 6–7 (detailing similar statements).

  This line of argument fell apart when petitioner's own expert testified
that he found no indication that petitioner was "[e]ither delusional or
psychotic."  Tr. 56 (Apr. 14, 2016).

  [4] Unable to cite any place where the State made this argument to the
state court, the Court claims that the State did so in the Eleventh
Circuit.  *Ante,* at 6–7, n. 1.  But even if that were so, it is hard to see
what that would have to do with the question whether the state court
thought that dementia could not satisfy the *Ford/Panetti* test.  And in
any event, the Court does not fairly describe the State's argument in
the Eleventh Circuit.  The State's Eleventh Circuit brief argued that
merely suffering from a mental condition like dementia is not enough to
render a prisoner incompetent to be executed; instead, the prisoner
must also establish that he lacks a rational understanding of the
reason for his execution.  See Brief for Appellee in No. 16–12279
(CA11), pp. 37–38 (Brief for Appellee) ("The fairest reading of the state
court's opinion is that it assumed that dementia and memory loss
caused by strokes is a mental illness and went straight to the rational
understanding question.  Thus, it is not that the trial court refused to

———————

consider Madison's claims pertaining to dementia—Madison cannot point to any portion of the state court order that says this—it is that the trial court correctly noted that Madison failed to prove that any dementia interfered with Madison's ability to have a rational understanding of his execution, including the reasons therefor"); *id.,* at 27 ("The Supreme Court has not held that a petitioner can show incompetence without demonstrating a mental illness or that dementia and memory loss definitively preclude rational understanding"); *id.,* at 29 ("To the extent the state court followed the lead of the Supreme Court, this Court, and the ABA and required Madison to show that a mental illness prevented him from having a rational understanding of his punishment, doing so was not an unreasonable application of clearly established federal law").

It is true that the State's brief, in addressing the standard for granting federal habeas relief under 28 U. S. C. §2254(d), stated that this Court "ha[d] never held that dementia or memory loss is sufficient to show a lack of rational understanding," Brief for Appellee 29, but that was because a claim under §2254(d) must be based on a clearly established Supreme Court holding. See Recording of Oral Arg. in No. 16–12279 (CA11, June 23, 2016), at 32:37–33:30 (State rejecting a suggestion that *Panetti* holds "if you don't remember committing the crime at all, and it is clear based on the medical testimony that you don't remember committing this crime, then you don't have a rational understanding of the factual basis for the imposition of the death penalty": "First of all, under AEDPA deference, I think that that is not the holding of *Panetti.* . . . I think under AEDPA deference, it's pretty clear that the holding of *Panetti* is very narrow. . . . I would say the holding in *Panetti* is that documented mental illness that results in a delusion has to be considered when talking about rational understanding"); *id.,* at 36:00–36:30 ("I think the Supreme Court has never held that not remembering something is equivalent to not having a rational understanding. I think that is just undeniably true. And if AEDPA deference applies, then I don't think the state court could have been unreasonable in rejecting the view that memory is required"). The State did not argue either that dementia cannot satisfy *Ford* and *Panetti* or that the state court based its decision on that ground. On the contrary, Alabama wrote that "even if the trial court had determined that dementia and severe memory loss—or even total amnesia— are insufficient to meet the rational understanding test, that finding would not contradict clearly established federal law." Brief for Appellee 29; see also *id.,* at 30 ("Even assuming the state court held, as a matter of law, that amnesia is not sufficient to show a lack of rational understanding, that determination was not unreasonable in light of clearly

State had made such an argument, what matters is the basis for the state court's decision, not what counsel for the State wrote or said.

I add one more comment regarding the majority's uncertainty about the basis for the state-court decision: Our decision two years ago in *Dunn* evinced no similar doubts. There, we said that the state court "held that, under this Court's decisions in *Ford* and *Panetti*, Madison was entitled to relief if he could show" that he lacks a rational understanding of the circumstances of his punishment. 583 U. S., at ___ (slip op., at 2) (quotation altered). And we said that the state court "determined that Madison is competent to be executed because—notwithstanding his memory loss—he recognizes that he will be put to death as punishment for the murder he was found to have committed." *Id.,* at ___ (slip op., at 4); see also *ibid.* (referring to the state court's "finding that Madison understands both that he was tried and imprisoned for murder and that Alabama will put him to death as punishment for that crime"). Why the majority cannot now see what it understood without any apparent difficulty two years ago is hard to grasp.

For all these reasons, what the Court has done in this case cannot be defended, and therefore it is hard to escape thinking that the real reason for today's decision is doubt on the part of the majority regarding the correctness of the

—————

established federal law").

The majority acknowledges that the State made this concededly correct habeas argument, but then oddly writes it off as an "additional" or alternative argument. *Ante,* at 7, n. 1. Yet, as the State's brief and oral argument illustrate, the State's core contention was that the state court did not unreasonably apply clearly established law under *Panetti*'s "very narrow" holding. (And as we later held in *Dunn,* the State was correct.) The majority simply cannot escape the inconvenient fact that the State never argued, as a non-AEDPA matter, that petitioner could be executed even if his dementia precluded a rational understanding.

ALITO, J., dissenting

state court's factual finding on the question whether Madison has a rational understanding of the reason for his execution.  There is no question that petitioner suffers from severe physical and mental problems, and the question whether he is capable of understanding the reason for his execution was vigorously litigated below.  But if the Court thinks it is proper for us to reach that question and to reverse the state court's finding based on a cold record, it should own up to what it is doing.

\*　　\*　　\*

Petitioner has abandoned the question on which he succeeded in persuading the Court to grant review, and it is highly improper for the Court to grant him relief on a ground not even hinted at in his petition.  The writ should be dismissed as improvidently granted, and I therefore respectfully dissent.